UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DONALD JAMES SWANK,

               Petitioner,

v.

RANDEE REWERTS,

               Respondent.

_____/

Case No. 1:22-cv-1139

Honorable Paul L. Maloney

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Donald Swank is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan. Following a jury trial in the Berrien County Circuit Court, Petitioner was convicted of one count of possession of a vehicle used to manufacture methamphetamine (obtaining or maintaining a methamphetamine laboratory), in violation of Mich. Comp. Laws § 333.7401c(2)(f); one count of manufacturing methamphetamine, in violation of Mich. Comp. Laws § 333.7401(2)(b)(*i*); one count of possession of methamphetamine, in violation of Mich. Comp. Laws § 333.7403(2)(b)(*i*); and one count of operation of a motor vehicle while under the influence of methamphetamine, in violation of Mich. Comp. Laws § 257.625. On January 8, 2018, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to concurrent prison terms of 12 to 30 years for obtaining or maintaining a methamphetamine laboratory, 12 to 30 years for manufacturing methamphetamine, 1 to 20 years for possession of methamphetamine, and 93 days for operation of a vehicle while under the influence of methamphetamine.

On November 28, 2022, Petitioner filed his habeas corpus petition raising the following six grounds for relief:

I.      [Petitioner's] right to confrontation was denied when Sgt. Nelson and several others testif[i]ed to what was said to them by Ms. Splunge about [Petitioner] without Ms. Splunge being present to testify and be cross examined to what she said, violating [Petitioner's] constitutional due process to a fair trial.

II.     Appellate counsel was ineffective for failing to investigate and bring up preserved issues that had merit[,] namely [a] violation of [Petitioner's] right to confront [witnesses] against [him] and prosecutorial misconduct.

III.    Prosecutorial misconduct where the State['s] attorney was vouching for his personal belief on a defense witness's truthfulness lending the weight of his office to sway the jury, preventing a fair adversarial process and preventing a fair trial.

IV.     [Petitioner's] right to a jury of a fair cross section from the community was denied as prohibited by [the] federal [C]onstitution and the Supreme Court[,] denying him a fair trial.

V.      [Petitioner] is entitled to a new trial where his daughter was removed from a public courtroom by a prosecutor who was in attendance of the trial and in no other way related to the matter at hand[,] in violation of [Petitioner's] state and federal constitutional rights to a public trial . . . .

VI.     [Petitioner's] procedural default doctrine rights were violated where counsel was ineffective in failing to investigate and argue inaccuracies in [the] habitual charge and improper scoring of PRV 2, PRV 5, PRV 7, and OV 14.

(Pet., ECF No. 1, PageID.7–17 (capitalization corrected).) Respondent asserts that Petitioner's

grounds for relief are meritless.[1] (ECF No. 14.) For the following reasons, the Court concludes

---

[1] Respondent also contends that all but one of Petitioner's grounds for relief are procedurally defaulted. (ECF No. 14, PageID.237–239.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir.

that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> This case arises out of a traffic stop that occurred on May 24, 2017 at 1:40 a.m. in Niles, Michigan. At trial, testimony revealed that a Niles police officer noticed a suspicious white van with Indiana plates driving on a short dirt road near a car dealership. The officer followed the van until it pulled into a Walgreens parking lot. The officer observed that the driver of the van had difficulty parking the vehicle even though the lot was mainly empty. The officer next observed a female exit the van, proceed into Walgreens, and then return to the van. The officer followed the van as it left the parking lot because his experience had taught him that individuals would come from Indiana to the 24-hour Niles Walgreens to buy Sudafed to make methamphetamine. The van then embarked on what can best be described as a circuitous route as the officer continued to follow. When the van entered onto a residential street, the officer noted that it was traveling 32 miles per hour in a 25 miles per hour zone. The van next abruptly pulled into a driveway of a home that no one in the van had any connection to, and the officer pulled his patrol car behind the van and activated his patrol car's lights.
>
> The officer made contact with [Petitioner], the driver and registrant of the van. When asked why he was driving on a dirt road behind a car dealership, [Petitioner] offered several explanations, none of which made any sense to the officer. [Petitioner] went on to explain to the officer that he drove his female passenger to Walgreens so that she could pick up a prescription. At the time of the initial stop, the officer noted that [Petitioner's] eyes were dilated, he was increasingly alert, "fidgety," and was becoming irritable. The officer, being Advanced Roadside Impairment Detection (ARIDE) certified, recognized those symptoms as signs of methamphetamine use. Additionally, the officer testified that he could smell alcohol on [Petitioner's] breath. During the initial stop, the officer asked [Petitioner] if had had been drinking to which [Petitioner] responded that earlier in the evening he drank some Fireball whiskey.

2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

The officer then ran a L.E.I.N. and discovered that there was an active warrant for [Petitioner] in Berrien County for retail fraud, prompting the arrest of [Petitioner]. A sealed box of Sudafed was discovered near the front passenger seat of the van. [Petitioner]'s female passenger, Dionne Splunge, admitted that she purchased the Sudafed at Walgreens for [Petitioner]. Staff at the Niles Walgreens store confirmed that a woman had just purchased Sudafed.

[Petitioner's] brother, Erik Swank, was sitting on a toolbox in between the van's two front seats. After being asked to exit the van, and as he was walking toward the officer's patrol vehicle, a pink or orange "pipe" fell to the ground. The officer also discovered a bag of methamphetamine in Erik's pocket and an additional container of methamphetamine tucked into the leg of his underwear.

Next, the officer began a search of the van. He discovered a metal pressure cooker behind the seats in the van, opened it and recognized that it was a one-pot laboratory for making methamphetamine. At that juncture the officer stopped the search of [Petitioner's] van because he was not certified to handle a methamphetamine laboratory.

Detective Jason Sweet from the Michigan State Police Southwest Enforcement Team (SWET) was called to properly investigate and dispose of the items in [Petitioner's] van. Sweet discovered items used in the manufacture of methamphetamine in the pressure cooker including an additional box of Sudafed in which all the tablets had been removed from the bubble container. He handed a piece of tubing from the pressure cooker to the arresting officer which field-tested positive for methamphetamine. According to the arresting officer, [Petitioner] initially denied knowing anything about the pressure cooker; however, he eventually acknowledged that Erik brought it into the van. [Petitioner] eventually admitted that methamphetamine would be in his system, but he did not feel that he was under the influence of methamphetamine. Subsequent blood-test results showed that [Petitioner] was positive for methamphetamine and benzoylecgonine, a metabolite of cocaine.

At trial, Erik testified on [Petitioner's] behalf. He explained that he was charged with manufacturing methamphetamine, operating a methamphetamine laboratory, possession of methamphetamine, and possession of other drugs (pills). Erik pleaded guilty to manufacturing methamphetamine and the other charges were dismissed. He testified that he had brought the pressure cooker into [Petitioner's] van, but [Petitioner] did not know anything about it or its contents. According to Erik, he did not make any methamphetamine in the van, nor did he plan to make any methamphetamine in the van. Rather Erik was along for the ride because he was going to be dropped off at a friend's house. Erik explained that [Petitioner] never made methamphetamine or helped Erik make methamphetamine. Further, Erik did not need the Sudafed purchased by Splunge because he already had everything that he needed. Erik admitted that he and [Petitioner] "snorted" methamphetamine in

4

the van however; Erik did not think that [Petitioner] knew it was methamphetamine because [Petitioner] usually used cocaine.

*People v. Swank*, No. 342905, 2019 WL 5275036, at *1–2 (Mich. Ct. App. Oct. 17, 2019).

Jury selection began on November 30, 2017. (Trial Tr. I, ECF No. 15-5.) Over the course of two days, the jury heard testimony from law enforcement officials, the director of the Berrien County forensics laboratory, the pharmacist for the Walgreens in Niles, a toxicologist from the Michigan State Police's Forensic Science Division, and Erik Swank. (Trial Tr. I & II, ECF Nos. 15-5, 15-6.) On December 1, 2017, after about only an hour of deliberation, the jury reached a guilty verdict. (Trial Tr. II, ECF No. 15-6, PageID.880–883.) Petitioner appeared before the trial court for sentencing on January 8, 2018. (ECF No. 15-7.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals, raising the following claims: (1) the trial court erred by denying Petitioner's motion to quash his bind over to circuit court following the preliminary examination; (2) the trial court erred by denying Petitioner's motion to suppress the items located in the van and the statement Petitioner made to the police; (3) the trial court erred by allowing the pharmacist to testify because the prosecution did not add her to its witness list until 15 days before trial; (4) the trial court improperly admitted character evidence pursuant to Rule 404(b) of the Michigan Rules of Evidence; (5) the trial court erred in denying Petitioner's motion for a mistrial because the court improperly admitted the National Precursor Log Exchange (NPLEX) logs regarding relevant purchases of pseudoephedrine; and (6) the trial court erred in assessing offense variable (OV) 14 at 10 points. *See Swank*, 2019 WL 5275036, at *2–10. The court of appeals affirmed Petitioner's convictions and sentences on October 17, 2019. *Id.* at *1. The Michigan Supreme Court denied Petitioner's application for allowance of appeal on June 30, 2020. *See People v. Swank*, 944 N.W.2d 693 (Mich. 2020).

On May 25, 2021, Petitioner, proceeding *pro se* filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, raising all six grounds for relief he now asserts in his federal habeas petition. (ECF No. 15-8.) The trial court denied his motion in an opinion and order entered on September 28, 2021. (ECF No. 15-9.) The court of appeals and supreme court denied Petitioner's applications for leave to appeal on March 31, 2022, and September 6, 2022, respectively (ECF Nos. 15-12, PageID.1250; 15-13, PageID.1324.) This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000);

*Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.  Discussion

### A.     Confrontation Clause

Petitioner's first ground for relief is that his rights to confrontation were violated when "Sgt. Nelson and several others testif[i]ed to what was said to them by Ms. Splunge about [Petitioner] without Ms. Splunge being present to testify and be cross examined to what she said." (ECF No. 1, PageID.7.)

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause, therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Petitioner raised his claim in his Rule 6.500 motion, and the trial court rejected it, stating:

[Petitioner]'s brief cites several instances where Ms. Splunge is referenced as a violation[] of the Confrontation Clause[.] None of the aforementioned examples concern testimony or statements made by Ms. Splunge, rather, they were all observations made by law enforcement about the actions of Ms. Splunge. The officers that testified about these observations were subject to cross examination.

[Petitioner] next alleges that questions asked to his brother Erik Swank as to the reason they brought Ms. Splunge violated his confrontation rights. Again no statements made by Ms. Splunge were entered into evidence in response to these questions.

Finally, [Petitioner] references the testimony of Ms. Erika Rodriguez concerning Ms. Splunge as a violation of his right to confrontation. Ms. Rodriguez was the Walgreens pharmacist that sold Ms. Splunge Sudafed. On direct examination, the prosecution asked Ms. Rodriguez "what did she ask for?" (in reference to what she bought at Walgreens). This was objected to by [Petitioner's] trial counsel as hearsay. The prosecution then reworded the question to Ms. Rodriguez as "Did you make a sale of something to her?" to which Ms. Rodriguez responded, "A Sudafed product."

In spite of the fact that the original question did not call for hearsay (commands are not hearsay because they do not involve an assertion. *See People v. Bennett*, 290 Mich. App. 465, 483; 802 N.W.2d 627 (2010)), the question was never answered. Again, the purpose of the question and the response given were the testifying witness's observations as to Ms. Splunge's actions.

9

[Petitioner] also referenced the usage of the same observations named above during the prosecution's closing statements, although it is not necessary to analyze them any further as an attorney's closing arguments are not evidence and it has already been established that the examples cited by [Petitioner] are not statements or testimony, and therefore his right to confront was satisfied when the people who made the observations testified at trial.

[Petitioner] does reference one instance where a statement given by Ms. Splunge to police was used during testimony taken at [a] status conference in anticipation of a motion to suppress and allegedly during preliminary examination. Trial counsel had argued that there was not probable cause to search [Petitioner's] van and had made a motion to suppress. During the taking of testimony from Sergeant Nelson, the prosecution asked: "What did Ms. Splunge say about any meth use in the van?" To which Sergeant Nelson replied: "As they were driving from South bend to Niles, Erik and Donald Swank were both smoking methamphetamine while going down the road[."]

Trial counsel objected for hearsay and the Court properly overruled under MRE 1101(b)(1) as this was a preliminary question of fact as to the admissibility of evidence to be determined by the Court and therefore the rules of evidence did not apply. MRE 1101(b)[.]

MRE 1101 would also prevent the statement from being hearsay at the preliminary exam under subsection (b)(8) as it was used to establish possession and ownership of the methamphetamine.

(Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.946–948 (citations to trial court records omitted).)

In his federal habeas petition, Petitioner challenges the trial court's decision by reiterating that the prosecutor elicited testimony regarding Ms. Splunge from Sergeant Nelson. (Pet'r's Br., ECF No. 2, PageID.78.) Petitioner takes issue with the fact that the prosecutor asked Sergeant Nelson about his interactions with Ms. Splunge. According to Petitioner, this testimony permitted the jury to insinuate that Ms. Splunge was the one who purchased the Sudafed that law enforcement found in the van. (*Id.*) A review of the trial transcript, however, reveals that at no time did Sergeant Nelson testify about statements made by Ms. Splunge. Instead, Sergeant Nelson testified that he had a conversation with Ms. Splunge, and that she was the individual whom he had seen earlier

getting out of the van, going into Walgreens, and getting back into the van. (Trial Tr. I, ECF No. 15-5, PageID.560.)

Petitioner again faults the prosecution, as well as his trial counsel, for referencing Ms. Splunge during their closing arguments. (Pet'r's Br., ECF No. 2, PageID.78–79.) However, the Court's review of the closing arguments leads to the conclusion that the trial court correctly noted that neither attorney made any reference to statements made by Ms. Splunge. Moreover, closing arguments do not constitute evidence.

Petitioner again takes issue with testimony Sergeant Nelson gave during a status conference and suppression motion hearing held on August 15, 2017. (*Id.*, PageID.81.) According to Petitioner, the prosecution asked Sergeant Nelson, "What did Ms. Splunge say about meth use in that van?" (*Id.*) Sergeant Nelson answered, "She advised as they were driving from South Bend to Niles, Erik and Donald [S]wank were both smoking methamphetamine while going down the road." (*Id.*)[2]

To the extent Petitioner takes issue with the trial court's conclusion that this statement was admissible under the Michigan Rules of Evidence, the trial court's determination is binding on this Court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). Furthermore, to the extent Petitioner contends his Confrontation Clause rights were violated during this pretrial hearing, the Supreme Court has

---

[2] In the response, Respondent indicates that he "has been in contact with Berrien County to obtain the transcript of the motion to suppress hearing," but that the transcript had not been received as of August 11, 2023, the date on which Respondent filed the response. (ECF No. 14, PageID.271 n.5.) Respondent notes, however, that the parties "do not dispute the contents of the transcript including the relevant line of questioning or the trial court's ruling." (*Id.*) Petitioner does not take issue with Respondent's representation.

referred to that right as "basically a trial right." *Barber v. Page*, 390 U.S. 719, 725 (1968); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) ("The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination."). There is no clearly established federal law suggesting that the right protected by the Confrontation Clause applies to pretrial hearings such as the one mentioned by Petitioner. *See United States v. Harris*, 403 U.S. 573, 584 (1971) (noting that Confrontation Clause precedent "seems inapposite to . . . proceedings under the Fourth Amendment").

In sum, a review of the record reflects that no testimonial statements made by Ms. Splunge were admitted at Petitioner's trial, thereby refuting the assertions Petitioner makes in his § 2254 petition. Moreover, given the lack of Supreme Court precedent holding that the Confrontation Clause right applies to pretrial hearings such as status conferences and suppression hearings, the state court's rejection of that portion of Petitioner's claim cannot have been contrary to, or an unreasonable application of, clearly established federal law. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("Given the lack of holdings from this Court [on the issue at hand], it cannot be said that the state court 'unreasonably applied clearly established Federal law.'"). Petitioner, therefore, is not entitled to relief with respect to habeas ground I.

### B.     Prosecutorial Misconduct

In his third ground for relief, Petitioner contends that the prosecutor committed misconduct by "vouching for his personal belief on a defense witness's truthfulness lending the weight of his office to sway the jury, preventing a fair adversarial process and preventing a fair trial." (Pet., ECF No. 1, PageID.11.) Specifically, Petitioner takes issue with the prosecutor referencing Petitioner's brother's testimony and stating, during closing argument, "I don't think you can trust anything that Eric Swank said." (Pet'r's Br., ECF No. 2, PageID.86.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations' . . . ." *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

Petitioner raised this claim in his Rule 6.500 motion, and the trial court rejected it, stating:

. . . . [T]he prosecution did not violate any rules of professional conduct, court rules, or any other rules by his statement.

The statement in question is as follows: "If I come into court on my brother's case and I'm already sentenced, nothing I say now matters to me. So if I come into court and I got nothing to lose and I can help my brother, I'm going to lie to help my brother." "I don't think you can trust anything that Erik Swank said."

. . .

Here, there was no such statement of personal belief or inference that the prosecution had some special knowledge unknown to the jury. Rather, the prosecution made an argument attacking the veracity of a witness based on inferences from the evidence presented at trial, a practice well within the bounds of ethical conduct. The prosecution may call the defendant and his or her witnesses liars. He or she may argue that a witness is or is not worthy of belief where there are testimonial conflicts or arguably incredible testimony. . . .

During his testimony at trial, Erik Swank claimed to have lied to the police and to the court. (Question: "Of course, you're going to lie to the officer if it's convenient for you?["] Response: "Well, if it's – I mean, I'm not trying to go to jail at that

point." (JTT VII, p. 70.) He then admitted to lying during his plea. (Question: "You made a conscious decision, while under oath, to lie to the judge?" Response: "Absolutely. When there's an officer who has made lies in his statements[]." [(]TT VIII, p. 73.)

(Berrien Cnty. Cr. Ct. Op. & Order, ECF No. 15-9, PageID.948–950.)

Petitioner does not present to this Court any argument regarding this issue other than the argument that he raised in his Rule 6.500 motion. Petitioner, therefore, fails to explain how the state court's analysis is in error. Moreover, Petitioner does not explain how the trial court's analysis is contrary to, or an unreasonable application of, the general standards set forth in *Darden* or *Donnelly*. This Court's review of trial court's determination reveals that it is entirely consistent with the clearly established federal law set forth in *Darden* and *Donnelly*.

Petitioner mischaracterizes the prosecutor's comments regarding Erik's credibility as vouching.[3] At no time did the prosecution attempt to bolster Erik's credibility. *See Francis*, 170 F.3d at 550. Moreover, the prosecutor did not invite the jury to believe there was other evidence justifying the prosecutor's belief in Petitioner's guilt. *See id.* at 551. Instead, given Erik Swank's testimony that he had lied to police as well as during his plea, the prosecutor simply invited the jury to draw an inference that Erik Swank was not credible from the testimony presented. Not every reference to the credibility of a witness is objectionable vouching. "[A] prosecutor may ask

---

[3] The Sixth Circuit has identified two types of objectionable vouching. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328–29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster his or her credibility. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994). The second type, also known as bolstering, occurs when the prosecutor invites the jury to believe there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

the jury to draw reasonable inferences of credibility from the evidence presented . . . ." *Willoughby v. White*, 786 F. App'x 506, 513 (6th Cir. 2019).

The prosecutor's statements during closing argument did not deny Petitioner a fair trial or improperly affect the outcome of the proceedings. Petitioner, therefore, is not entitled to relief with respect to habeas ground III.

### C.    Fair Cross-Section Jury Claim

In his fourth ground for relief, Petitioner contends that his right to "a jury of a fair cross section from the community was denied." (Pet., ECF No. 1, PageID.13.) According to Petitioner, "[n]o black jurors were on the venire [his] jury was picked from." (*Id.*) Petitioner alleges this "was a big problem since Petitioner was testified to as being with a 'Black Woman' during the alleged offense." (*Id.*) Petitioner further states that Berrien County's jury wheel for his case underrepresented individuals who identify as African American, Hispanic, and Native American. (*Id.*) According to Petitioner, the result of his trial would have been different "[h]ad African American jurors been in the pool, and selected." (Pet'r's Br., ECF No. 2, PageID.90.)

It is well established that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial" and "is fundamental to the American system of justice." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The fair cross-section requirement, however, applies to the venire from which a jury is drawn, and not the petit jury itself. *See id.* at 538 (noting that the Court was "impos[ing] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"). To establish a prima facie violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;

and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Petitioner raised his claim in his Rule 6.500 motion, and the trial court, relying on *Taylor* and *Duren*, summarily rejected Petitioner's claim. (Berrien Cnty. Cir. Ct. Op. and Order, ECF No. 15-9, PageID.950–951.) The state court's application of *Taylor* and *Duren*—the correct federal constitutional standard for resolving the claim—eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Taylor* and *Duren* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if he shows that the determination of Petitioner's claim is an unreasonable application of *Taylor* and *Duren* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d). Petitioner has not made and cannot make that showing.

The trial court applied the federal constitutional standard and rejected Petitioner's claim for the following reasons:

> [Petitioner] does not provide any evidence as to how his jury pool was selected or how that manner is discriminatory other than to claim that there were no African [Americans] in his jury pool. "Merely showing one case of alleged underrepresentation does not rise to a 'general' underrepresentation that is required for establishing a prima facie case." *People v. Howard*, 226 Mich. App. 528, 533; 575 N.W.2d 16, 22 (1997); *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986).

(Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.950–951.) The trial court's assessment of the record is unassailable. Petitioner does allege that African Americans are a distinctive group and that they "comprise about 20% . . . of the population of the Judicial district of Berrien County." (Pet'r's Br., ECF No. 2, PageID.89.) Petitioner, however, provides no evidence that any underrepresentation of African Americans in the venire was due to systematic exclusion, stating only that he "will demonstrate that the discrepancy occurred, not just occasionally, but in most weekly venires for the period preceding his trial and post-trial period." (Pet'r's Br., ECF No. 2, PageID.90.) Petitioner provided no data to the trial court, and now provides no data to this Court, regarding those venires to support his claim.

At best, Petitioner has conclusorily stated that African Americans were underrepresented in his jury venire. The state court rejected that showing as insufficient. That rejection is entirely consistent with *Duren*. Petitioner is required "to show that the underrepresentation of the

[distinctive group], generally and on his venire, was due to their systematic exclusion in the jury-selection process." *Duren*, 439 U.S. at 366. "[D]efendants 'must show more than that their particular panel was unrepresentative[;] *Duren* states that we look at the 'venire**s**' from which 'jur**ies**' are selected . . . ." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (emphasis added).  Put simply, Petitioner has failed to demonstrate that the trial court's rejection of his jury selection claim is an unreasonable application of clearly established federal law or is based on an unreasonable determination of the facts; therefore, he is not entitled to relief on habeas ground IV.

### D.   Removal of Daughter from Courtroom

As his fifth ground for relief, Petitioner contends that his constitutional rights were violated when his daughter was "forced to leave the courtroom by a prosecutor that happened to be there sitting and observing the trial." (Pet., ECF No. 1, PageID.15.) Petitioner contends that because his daughter was the only member of the public present, her removal violated his "right to a public trial." (*Id.*)

The record reflects that during the prosecutor's cross-examination of Erik Swank, Petitioner began to have an outburst. (Trial Tr. II, ECF No. 15-6, PageID.794.) Ultimately, the jury was removed from the courtroom, and Petitioner then exclaimed, "You're going to kick my daughter out of here for—for me looking at her? I didn't say a word to her." (*Id.*, PageID.795.) The court then took a short recess for the parties to "think about what transpired." (*Id.*, PageID.796.)

When proceedings reconvened, the trial judge set forth the following statement to summarize what had occurred:

> THE COURT: Okay. We continue on the record in the presence of the defendant, not in the presence of the jury.

> Okay. A number of things happened there, Counsel. I'll kind of go through how I plan to handle it, and then I'll hear any suggestions you have or objections you might have.
>
> Let me start, Mr. Swank, with you. Just for the record—
>
> Apparently—I didn't know that was your daughter. But the reason the woman— She had some dark and then a purple streak or something in her hair. The reason she was asked to leave the courtroom was because the two of your were mouthing words back and forth, and we can't allow that type of communication. But it was nothing personal. That was the reason. And I've instructed the bailiffs and the deputies to handle it that way. . . .

(*Id.*, PageID.798–799.) Petitioner's counsel then moved for a mistrial premised upon several points, including the fact that the removal of Petitioner's daughter violated his right to a public trial. (*Id.*, PageID.802.) The trial court denied the motion. (*Id.*)

> Petitioner raised his claim in his Rule 6.500 motion, and the trial court rejected it, stating:
>
> Here, there was no such closure, rather, one person was removed from the courtroom. The removal occurred during the testimony of [Petitioner's] brother Erik Swank during a heated exchange with the prosecution concerning his veracity. In the midst of the exchange, [Petitioner's] daughter was removed from the courtroom (JTT VII, p. 75-77.) Trial counsel requested a mistrial which was denied. The trial court Judge explained "[C]ourtroom security is—is a big issue in this county, particularly this courtroom given what occurred here a little over a year ago (referencing a shooting occurring in the Berrien County Courthouse on 7/11/16 in which several court staff and members of the public were killed or injured.) So that's why we're very vigilant in terms of communications between people in the gallery and defendants in custody." (JTT VII, p. 102.)

(Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.951–952.)

The Sixth Amendment provides that a criminal defendant "shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (internal quotation marks and citations omitted). The right to a public trial, however, "may give way in

19

certain cases to other rights or interests. . . . Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.* at 45.

At issue in *Waller* was the court's decision to fully close the courtroom to the public. A full closure refers to a "closure where the entire public, including the media, is excluded from the courtroom." *Drummond v. Houk*, 797 F.3d 400, 402 (6th Cir. 2015). The *Waller* Court set forth a set of explicit rules for a trial court to consider when ruling upon a request to fully close a courtroom. Specifically,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

Here, Petitioner contends that the trial court failed to consider the rules set forth in *Waller* because the trial court failed to make any findings to support the removal of Petitioner's daughter from the courtroom. (Pet'r's Br., ECF No. 2, PageID.93–94.) However, as the United States Court of Appeals for the Sixth Circuit recently noted, "[i]t is not clearly established . . . that those specific rules [set forth in *Waller*] apply to partial courtroom closures." *Johnson v. Rewerts*, No. 22-1437, 2022 WL 16908037, at *2 (6th Cir. Nov. 2, 2022) (citing *Drummond*, 797 F.3d at 403–04). Rather, the "only rule that Supreme Court caselaw clearly establishes as applicable to even partial closures—and, thus, the only rule applicable to such closures for during § 2254(d)(1) analysis—is *Waller*'s general rule: 'a trial court must balance the interests for and against closure.'" *Id.* (quoting *Drummond*, 797 F.3d at 402, 404).

Here, the trial court indicated that Petitioner's daughter was removed from the courtroom Because she and Petitioner were "mouthing words back and forth, and we can't allow that type of communication." (Trial Tr. II, ECF No. 15-6, PageID.799.) By placing that statement on the

20

record, the trial court did all that clearly established federal law requires with respect to partial closures and removal of individuals from the courtroom: the court disclosed the interest against which he weighed Petitioner's interest in a public trial. Given the lack of Supreme Court precedent suggesting that the factors set forth in *Waller* apply to partial closures of the courtroom, the state court's rejection of Petitioner's claim cannot have been contrary to, or an unreasonable application of, clearly established federal law. *See Carey*, 549 U.S. at 76. Petitioner, therefore, is not entitled to relief on habeas ground V.

### E.    Ineffective Assistance of Trial and Appellate Counsel

As his second ground for relief, Petitioner contends that appellate counsel was ineffective for raising meritorious issues, such as a "violation of [Petitioner's] right to confront [witnesses] against [him] and prosecutorial misconduct." (Pet., ECF No. 1, PageID.9.) In his last ground for relief, Petitioner contends that trial counsel was ineffective for failing to "investigate and argue inaccuracies in [the] habitual charge and improper scoring of [Prior Record Variable (PRV) 2, PRV 5, PRV 7, and OV 14." (*Id.*, PageID.17.)

### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the [Petitioner] resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The [Petitioner] bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see*

*also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the [Petitioner] is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is

"highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d), analysis of counsel's performance. In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance of trial and appellate counsel claims in his Rule 6.500 motion, and the trial court addressed them under the following standard:

> A defendant bears the burden of establishing ineffective assistance of counsel. *People v. Hoag*, 460 Mich. 1, 6 (1999). To establish ineffective assistance of counsel, a defendant must first establish that the counsel's performance fell below an objective standard of reasonableness and must overcome a strong presumption that counsel's assistance constituted sound trial strategy. *People v. Stanaway*, 446 Mich. 643, 687 (1994). Second, a defendant must show that there is a reasonable probability that, in the absence of counsel's error, the result of the proceedings would have been different. *Id.* at 687–688.
>
> Good cause for failing to raise an issue on appeal may be established by demonstrating ineffective assistance of appellate counsel "or by showing that some external factor prevented counsel for previously raising the issue." *People v. Reed*, 449 Mich. 375, 378; 535 N.W.2d 496 (1995). Defendant bears the burden of establishing ineffective assistance of counsel. *People v. Hoag*, 460 Mich. 1, 6; s594 N.W.2d 57 (1999). The test for ineffective assistance of appellate counsel is the same test for ineffective assistance of counsel. *People v. Pratt*, 254 Mich. App. 425, 430; 656 N.W.2d 866 (2002).
>
> Appellate counsel's failure to raise an arguable issue is not the test for establishing good cause under MCR 6.508(D). *Reed, supra* at 382. "Failure to assert all arguable issues is not sufficient to overcome the presumption that appellate counsel provided effective assistance in selecting the issues to present." *Id.* at 391. On the contrary, appellate counsel properly should "winnow out weaker arguments and focus on those more likely to prevail." *Id.* The test for whether such decision constitutes ineffectiveness is whether a reasonable appellate attorney would have chosen to raise the issue and whether raising the issue would, with reasonable probability, have obtained a better result for Defendant. *Id.* "In reviewing a claim for ineffective

> assistance of counsel, a reviewing court must make every effort to eliminate the distorting effect of hindsight." *People v. LaVearn*, 448 Mich. 207, 216; 528 N.W.2d 721 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 689; 104 S. Ct. 2052 (1984)).

(Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.952–953.) Although the trial court cited state court authority for the standard, the standard applied is identical to *Strickland*. Moreover, in *Stanaway*, the supreme court identified *Strickland* as the source of the standard. *Stanaway*, 521 N.W.2d at 579. Thus, there is no question that the trial court applied the correct standard. As explained above, the state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. Petitioner can only overcome the deference afforded state court decisions if the determinations regarding Petitioner's ineffective assistance claims are unreasonable applications of *Strickland* or if the state court's resolutions were based on unreasonable determinations of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider whether the trial court reasonably applied the standard for Petitioner's claims of ineffective assistance of trial and appellate counsel.

### 2.    Ineffective Assistance of Trial Counsel

In his sixth ground for relief, Petitioner echoes a claim raised for the first time in his motion for relief from judgment: he contends that trial counsel was ineffective "in failing to investigate and argue inaccuracies in [the] habitual charge and improper scoring of PRV 2, PRV 5, PRV 7, and OV 14." (Pet., ECF No. 1, PageID.17; Mot. for Relief from J., ECF No 15-8, PageID.909.) Although Petitioner's statement of the issue has remained the same, the nature of his argument has changed several times.

In his motion for relief from judgment, Petitioner argued only that the trial court erred under state law when it scored the variables and when the court permitted Petitioner to be sentenced as a fourth habitual offender. (*See* Br. In Supp. Of Mot. for Relief from J., ECF No. 15-8,

PageID.935–940.) In his appellate briefs and his petition, Petitioner added a new claim: that his sentence was unconstitutional because it was based on "judicial fact-finding" in violation of Petitioner's Sixth Amendment right to a jury trial. (*See, e.g.*, Pet'r's Appl. For Leave to Appeal to the Mich. Ct. App., ECF No. 15-13, PageID.1365–1371; Pet'r's Br., ECF No. 2, PageID.95–101.) Then, in his response brief, Petitioner raised a new argument for the first time: the information upon which his sentence was based was "materially false" and the trial court relied on that false information in imposing the sentence such that Petitioner's due process rights were violated. (Pet'r's Resp. Br., ECF No. 19, PageID.1492.)

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275–77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365–66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

Fair presentation has a substantive component and a procedural component. With regard to substance, fair presentation is achieved by presenting the asserted claims in a constitutional context through citation to the Constitution, federal decisions using constitutional analysis, or state decisions which employ constitutional analysis in a similar fact pattern. *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993); *see also Picard*, 404 U.S. at 277–78. With regard to procedure, the

fair presentation requirement is not satisfied when a claim is presented in a state court in a procedurally inappropriate manner that renders consideration of its merits unlikely. *Olson v. Little*, 604 F. App'x 387, 402 (6th Cir. 2015) ("[W]here the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefor,' . . . does not, for the relevant purpose, constitute 'fair presentation.'" (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989))); *see also Ogle v. Ohio Dep't of Rehab. & Corr.*, No. 17-3701, 2018 WL 3244017, at *2 (6th Cir. Feb. 27, 2018); *Stokes v. Scutt*, 527 F. App'x 358, 363–64 (6th Cir. 2013). Presentation of an issue for the first time on discretionary review to an appellate court does not fulfill the requirement of "fair presentation." *Castille*, 489 U.S. at 351.

Petitioner never presented his claim that his sentences violated his jury-trial right to the trial court. He presented it for the first time on discretionary review before an appellate court. Thus, that claim is unexhausted. He never raised the due process claim in the state courts; thus, that claim is unexhausted as well. Although the Court may not grant habeas relief on such unexhausted claims, 28 U.S.C. § 2254(b)(1), the Court is permitted to deny relief on the merits, 28 U.S.C. § 2254(b)(1).

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw*, 546 U.S. at 76; *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Pulley*

*v. Harris*, 465 U.S. 37, 41 (1984). Claims concerning the improper application of sentencing guidelines are state law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373–74 (1982) (holding that federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000) (discussing that alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

Petitioner attempts to bring his sentencing claims within the bounds of habeas cognizability with the three claims described above: first, counsel rendered ineffective assistance at sentencing; second, the sentence violated Petitioner's jury trial right because it is founded upon "judge found" facts; and third, the sentences violate due process because they are based upon materially false information. Each claim is addressed below.

### a.     "Judge Found" Facts

Petitioner asserts that the trial court improperly used judicially determined facts to determine Petitioner's sentences. (Pet'r's Br., ECF No. 2, PageID.95.) He cites *Alleyne v. United States*, 570 U.S. 99 (2013), as support for his claim. In *Alleyne*, the Supreme Court held that "any fact that, by law, increases the penalty for a crime . . . must be submitted to the jury and found beyond a reasonable doubt." 570 U.S. at 103. Thus, "mandatory minimum sentences may only be increased on the basis of facts found by a jury or admitted by a criminal defendant." *Robinson v. Woods*, 901 F.3d 710, 712 (6th Cir. 2008).

In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), the Michigan Supreme Court held that, under *Alleyne*, the Michigan sentencing guidelines scheme violated the Sixth Amendment, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or

found by the jury to score offense variables [] that *mandatorily* increase the floor of the guidelines minimum sentence range." *Lockridge*, 870 N.W.2d at 506 (emphasis in original).[4]

The Michigan Supreme Court's remedy for the unconstitutionality of the Michigan guidelines was to sever and strike the mandatory component of the guidelines and make the guidelines advisory only. *Id.* at 520–21 (relying on *United States v. Booker*, 543 U.S. 220, 264–65 (2005), and holding that the remedy for the unconstitutionality of the mandatory federal sentencing guidelines was to sever only the mandatory component, still requiring courts to consider the guidelines, but making them advisory and subject to review for reasonableness). Petitioner was sentenced after *Lockridge*. Any suggestion that post-*Lockridge* sentences are the product of mandatory guidelines is plainly wrong. Because the Michigan guidelines are advisory only, the trial court's determination of Petitioner's minimum sentences was purely discretionary. *See, e.g.*, *Torres v. Rewerts*, No. 18-1935, 2018 WL 7317219, at *2 (6th Cir. Dec. 19, 2018) (noting that, where a petitioner is sentenced after Lockridge, "it may be presumed that the sentencing court used an advisory sentencing scheme rather than the mandatory scheme . . .")

The use of "judge found" facts to support an exercise of discretion when imposing sentence could not violate any Sixth Amendment right. From the inception of this line of authority in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to its most recent refinement in *Alleyne*, the United States Supreme Court has never suggested that judicial fact-finding in support of the court's exercise of discretion, as happened here, violates the Sixth Amendment. *See Booker*, 543 U.S.

---

[4] On August 24, 2018, the Sixth Circuit agreed with the *Lockridge* analysis. *Robinson*, 901 F.3d at 710. The *Robinson* court held that the Supreme Court's decision in *Alleyne* clearly established that Michigan's mandatory minimum sentencing scheme was unconstitutional. *Robinson*, 901 F.3d at 714. The court reasoned that, "[a]t bottom, Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences." *Id.* at 716 (citing *Alleyne*, 570 U.S. at 111–12).

28

at 232 ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *see also Apprendi*, 530 U.S. at 481 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute."); *Reign v. Gidley*, 929 F.3d 777, 781 (6th Cir. 2019) ("But the constitutional error here was the mandatory application of the guidelines, not merely the consideration of judge-found facts."); *United States v. Smith*, 749 F.3d 465, 487 (6th Cir. 2014) ("But both *Apprendi* and *Alleyne* took care not to disturb the district court's discretionary fact-finding in other circumstances. . . . Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury." (internal citation omitted)).

Petitioner's "judge found" facts claim is wholly without merit.

### b.  Materially False Information

A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States*, 445 U.S. 552, 556 (1980); *see also United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988); *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner claims his due process rights were violated because "[t]here was never any evidence produced that Petitioner was the leader in a multiple offender situation." (*Id.*) Petitioner

does not specifically identify a "false fact" that the trial court relied upon. Instead, he contends that the court's determination regarding leadership was contrary to his brother's admissions—that Petitioner "knew nothing about" the methamphetamine manufacturing equipment. (*Id*.) The trial judge found the brother's testimony to be "anything but credible." (Sentencing Tr., ECF No. 15-7, PageID.894.) Petitioner's brother's testimony does not suffice to show that the information before the sentencing court was false; therefore, Petitioner has failed to carry his burden under *Tucker*.

Petitioner alternatively argues that he cannot be considered a leader in a multi-offender situation because only two people were charged and the state statute requires three people. Petitioner is wrong with respect to both claims. First, the statute does not require that multiple offenders be charged. It speaks only to a "multiple offender situation;" it says nothing about the multiple offenders being charged. Mich. Comp. Laws § 777.44(1). The Michigan courts have concluded that a "multiple offender situation . . . refers to a situation in which more than one person violated the law while part of a group." *People v Jones*, 829 NW2d 350, 352 (2013), *vacated in part on other grounds*, 834 N.W.2d 485 (Mich. 2013). The trial court and the court of appeals identified record facts to support the determination that Petitioner's case presented a "multiple offender situation." (*See* Sentencing Tr., ECF No. 15-7); *Swank*, 2019 WL 5275036, at *10. Petitioner has not shown that those facts were false.

Petitioner's further claim that a "multiple offender situation" requires three offenders finds no support in the statute. The statute requires three or more offenders only if the sentencing court determines that more than one offender is a "leader." Mich. Comp. Laws § 777.44(2)(b). Moreover, using the *Jones* definition, there were three offenders in Petitioner's case, Petitioner, his brother, and Ms. Splunge.

In short, Petitioner's due process sentencing claim is meritless.

### c.      Ineffective Assistance

Moving past Petitioner's judge found facts claim and his false facts claim, Petitioner also contests counsel's assistance relating to three distinct aspects of his sentence. First, Petitioner contends his counsel should have objected to Petitioner being sentenced as a fourth habitual offender rather than as a multiple offender under the controlled substances statutes. (Pet'r's Br., ECF No. 2, PageID.95.) Second, Petitioner claims that counsel failed to convincingly argue that prior record variables 2, 5, and 7 should have been scored differently. (*Id.*, PageID.97–99.) Finally, Petitioner argues that counsel could have done something more with regard to offense variable 14.

### i.      Fourth Habitual Offender vs. Statutory Multiple Offender

Petitioner claims that he could have gained some advantage if counsel argued for Petitioner's conviction as a multiple controlled offense offender rather than as a fourth habitual offender. Mich. Comp. Laws § 333.7413 provides that an individual convicted of a second or subsequent controlled substance offense may be imprisoned for a term not more than twice the term otherwise authorized. The Michigan courts have interpreted "twice the term" to permit doubling of both ends of the minimum sentencing guidelines range as well as the maximum sentence. *See, e.g.*, *People v. Thornton*, No. 350952, 2021 WL 529700, at *4 (Mich. Ct. App. Feb. 11, 2021) (citing *People v. Lowe*, 773 N.W.2d 1 (Mich. 2009)). Mich. Comp. Laws § 769.12, on the other hand, would permit a maximum term of life imprisonment and double the upper limit of the minimum sentence range; but the lower limit of the minimum sentence range would stay the same. Although doubling the minimum sentence range is certainly not required under § 333.7413,

if the trial court were to double the range, it would possibly foreclose a minimum sentence as low as that permitted under § 769.12—at least without departing downward from the guidelines.

The trial court concluded that Petitioner could not have gained any advantage had counsel pushed for Petitioner to be sentenced under § 333.7413 rather than § 769.12. (Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.954.) Indeed, the trial court stated that if counsel had challenged the sentence as urged by Petitioner, he would have ended up with the same maximum sentence, but he would have likely faced a higher minimum because the court could not have sentenced Petitioner to a minimum of 1 year unless the court justified the downward departure. Moreover, ultimately, the sentence for the possession offense § 333.7403 was and is completely subsumed within the much longer concurrent sentences for the offenses under § 333.7401. Because Petitioner had failed to show that the result would have been any different, the trial court rejected this ineffective assistance claim. That determination is entirely consistent with and a reasonable application of *Strickland*.

### ii.      Prior Record Variables

The trial court reached the same conclusion with regard to Petitioner's prior record variable claim. The court explained that Petitioner's prior record variables were scored at 120 points. (Berrien Cnty. Cir. Ct. Op. & Order, ECF No. 15-9, PageID.954.) Even if counsel prevailed on all of the challenges urged by Petitioner, the score would have been 85 points. (*See* Pet'r's Br. in Supp. of Mot. for Relief from J., ECF No. 15-8, PageID.938–939 (explaining that Petitioner's prior record variable score would have been 35 points lower if his arguments prevailed).) Any score over 74 points would yield the same minimum guidelines range. If Petitioner would fall in the same guidelines range, there could be no prejudice. *See, e.g.*, *Lewis v. Davids*, No. 21-1344, 2021 WL 7451132, at *5 (6th Cir. Dec. 3, 2021) ("Lewis still fell within the same guidelines range

because he still fell in the same grid . . . [t]hus there had been no prejudice. . . . If there was no prejudice, there was no ineffective assistance of counsel."); *Sherman v. Davids*, No. 1:19-cv-840, 2020 WL 132376, at *7 (W.D. Mich. Jan. 13, 2020) (stating that "the appellate court's determination that no prejudice could result where the scored guidelines fall into the [same] minimum sentence range . . . is logically unassailable"). Accordingly, the trial court's rejection of this ineffective assistance claim is entirely consistent with, and a reasonable application of, *Strickland*.

### iii.    Offense Variable Score

Finally, Petitioner contends his counsel should have attacked the scoring of offense variable 14. The scoring of that variable is discussed above.

The trial court rejected this claim because counsel, in fact, argued that the variable should have been scored at 0 points because Petitioner was not the leader in a multiple offender situation. (Sentencing Tr., ECF No. 15-7, PageID.894, 899.) According to counsel, if anyone fit that description, it was Petitioner's brother. (*Id.*)

In rejecting this ineffective assistance claim, the trial court noted that Petitioner "offered no argument as to how his counsel was ineffective as to this variable." (Berrien Cnty. Cir. Ct. Op. and Order, ECF No. 15-9, PageID.894.) Moreover, the Michigan Court of Appeals concluded that the variable was scored correctly; the challenge was meritless. *Swank*, 2019 WL 5275036, at *10. That determination binds this Court and forecloses any claim that counsel rendered ineffective assistance based on an argument that her objection to the scoring was somehow inadequate. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Accordingly, the trial court's rejection of this ineffective assistance claim is entirely consistent with, and a reasonable application of, *Strickland*.

In sum, Petitioner has not demonstrated that the state court's rejection of his claims of ineffective assistance premised upon alleged sentencing errors is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground VI.

### 3.   Ineffective Assistance of Appellate Counsel

As his second ground for relief, Petitioner contends that appellate counsel was ineffective for raising meritorious issues, such as a "violation of [Petitioner's] right to confront [witnesses] against [him] and prosecutorial misconduct." (Pet., ECF No. 1, PageID.9.) Essentially, Petitioner faults appellate counsel for not raising Grounds I and III, IV, and V set forth above. (Pet'r's Br., ECF No. 2, PageID.83.)

Petitioner raised this argument in his motion for relief from judgment, and the trial court rejected it, stating: "As explained throughout the above analysis, none of the arguments [Petitioner] has attempted to make have any merit. Therefore[,] his appellate counsel would have no reason to raise any of these topics." (Berrien Cnty. Cir. Ct. Op. and Order, ECF No. 15-9, PageID.953.) As thoroughly discussed *supra*, Petitioner's other grounds for relief lack merit. Accordingly, Petitioner's "appellate counsel's failure to raise [those] claim[s] on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of appellate counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief on habeas ground II.

**IV.    Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

**<u>Conclusion</u>**

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability.

Dated:   <u>October 20, 2023</u>                     <u>/s/ Paul L. Maloney</u>
                                                    Paul L. Maloney
                                                    United States District Judge